IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: | ) Bankruptcy No. 06-23936 - JKF |
| | ) |
| GARTH LANSAW and | ) Chapter 13 |
| DEBORAH LANSAW, | ) |
| | ) Related to Docket No. 19 |
| Debtors. | ) |

- - - - - - - - - -

| | |
|---|---|
| GARTH LANSAW and | ) |
| DEBORAH LANSAW, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Adversary No. 06-02645 - JKF  File |
| | ) |
| FRANK ZOKAITES, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION[1]

In this Adversary, Debtors seek an injunction against their landlord, the defendant, Frank Zokaites, to stop him from violating the automatic stay and to prevent him from interfering with their business, the operation of a child daycare center. At Docket No. 19 in the bankruptcy case, Debtors also seek an order permitting the rejection of the lease of the premises where the daycare conducts it business. Zokaites objects to both.

The case was tried on October 3 and 4, 2006. The parties have refused to provide a transcript of the trial. Thus there are no citations to a transcript herein. The Court notes, however, that the relevant trial exhibits include: copies of the landlord's sign,[2] of the padlocked

---

[1] The court's jurisdiction was not at issue. This Memorandum Opinion constitutes our findings of fact and conclusions of law.

[2] Plaintiffs' Exhibit 1

premises,[3] of some of the state court pleadings and miscellaneous papers,[4] Debtor's sign,[5] the notice of the bankruptcy filing sent to Attorney Hulton for Mr. Zokaites on August 17, 2006,[6] additional photographs of the signs,[7] the 1999 lease[8] and Amendment No. 1,[9] to that lease, the non-jury verdict of Judge Folino dated May 10, 2006,[10] photographs of the Zokaites leasehold,[11] photographs of parts of the DiCesare space[12] and floor plan,[13] and the DiCesare lease.[14] The Lansaws' 2004 and 2005 tax returns are also in evidence.[15]

The relationship dates back to 1999 when the Debtors found vacant space in a building owned by Frank Zokaites and entered into a lease dated November 1, 1999 (Defendant's Exhibit 1). The move from one location to another resulted in lost clients, and Debtors fell behind in the rent in 2001. Zokaites confessed judgment against Debtors, who filed bankruptcy. Zokaites

---

[3] Plaintiffs' Exhibit 10

[4] Plaintiffs' Exhibits 11-23, 27

[5] Plaintiffs' Exhibit 25

[6] Plaintiffs' Exhibit 15

[7] Defendant's Exhibit 58, photographs of May 8, 2006 sign

[8] Defendant's Exhibit 1

[9] Defendant's Exhibit 5

[10] Defendant's Exhibit 26

[11] Defendant's Exhibits 10-13

[12] Defendant's Exhibit 33

[13] Defendant's Exhibit 32

[14] Defendant's Exhibit 31

[15] Defendant's Exhibits 51 and 52

negotiated with Debtors during the bankruptcy case, and the parties signed "Amendment No. 1" (Defendant's Exhibit 5) to the lease on June 22, 2002. The Amendment extended the lease term to October 31, 2009, and increased the base rent, effective July 1, 2002, from $3,357.11 per month to $4,157.92 per month, Certain other charges, utilities and an annual escalation clause of at least 5% tied to the Pittsburgh metropolitan consumer price index were also part of the rent. The bankruptcy was voluntarily dismissed after the Amendment to the lease was approved.

At a certain point, Debtors believed they had cured the arrears that formed the basis for the rent increase and contended that Amendment No. 1 expired. Zokaites refused to accept rent payments in amounts less than those stated in Amendment No. 1. In June 2005, Debtors sued in state court, seeking a declaratory judgment that Amendment No. 1 had terminated. The Complaint raised other allegations, including that Zokaites had breached the lease by locating an automobile service business in the space adjacent to the daycare. Debtors contended that the new tenant used toxic and hazardous chemicals that were detrimental to Debtors and their clients. Zokaites responded to that Complaint.

Other litigation was pending between these parties. Several months previously, Zokaites had initiated two proceedings of his own, one in ejectment on which he confessed judgment, and one to confess judgment in the amount of $405,693.80 which he contended was the accelerated rent due under Amendment No. 1. He then garnished Debtors' bank accounts. The confessed judgments have been opened but remain unsatisfied. In September of 2005, Zokaites also posted a large four-by-four foot sign in the parking lot in front of Debtors' childcare center that announced, "Forever Young Daycare is behind on their rent and I am evicting them. /s/ Frank

3

Zokaites, Landlord."[16] He took this action despite a court order in the confession of judgment proceeding that stayed all judicial and extrajudicial actions respecting Debtors' possession and enjoyment of the premises.

Debtors responded to the sign by posting their own sign in a window of the daycare, stating, "We Have Filed a Law Suit Against Frank Zokaites. He Is In Violations of Judge Folino's Court Order. His Rent Is Being Held In a Court-Ordered Escrow Account. We Owe Him Nothing."[17] Zokaites sued them in a Complaint for Injunctive Relief and Damages on September 22, 2005, and Debtors counterclaimed for defamation, interference with contractual relations and false litigation/invasion of privacy. That Complaint is still pending in state court.

The declaratory judgment action commenced by Debtors in June 2005 was tried without a jury on May 8 and 9, 2006, and resulted in a judgment in favor of Zokaites. The parties dispute specifically what issues were and were not tried and have not provided a transcript. This court has nothing of record that explains the judgment that was entered. The parties agree, however, that the judgment confirmed Zokaites' views that Amendment No. 1 was not terminated and that the rent due was as stated in that document. The non-jury verdict was issued on May 10, 2006 (Defendant's Exhibit 26). During trial, Zokaites put the same four-by-four foot sign back on the property for a brief time. Although Zokaites contends that he covered the writing on the sign with his jacket, examination of the photographs taken on May 8, 2006, (Defendant's Exhibit 58), establishes that not all of the words were covered and the meaning of the visible words, "Fo.....ng

---

[16] Plaintiffs' Exhibit 1

[17] Plaintiffs' Exhibit 25

4

Behind In Their Rent and I Am Evicting Them. Frank Zokaites Landlord." is clear.[18] At one point, the sign was uncovered.[19] Some parents saw it again, as Darlene Wisniewski, one of those parents, testified.

To that point in their relationship, the landlord was making efforts to evict the Debtors and to collect the rents due under Amendment No. 1, and Debtors were trying to remain in the premises. However, those positions are now reversed. Prepetition, on June 1, 2006. Debtors entered into a new lease with a different landlord for a different facility (Defendant's Exhibit 31). Debtors did not inform Zokaites that they were leaving his building and did not inform the new landlord, Patrick DiCesare, that they were obligated on a lease with Zokaites through October, 2009.

When Zokaites learned about the new lease, he served a Notice of Distraint for Rent[20] at the daycare center on August 15, 2006. Debtors filed this Chapter 13 the following day, August 16, 2006. Notice was provided to Zokaites' attorney by letter dated August 17, 2006.[21]

---

[18]Defendant's Exhibits 58-B and 58-H

[19]Defendant's Exhibit 58-I

[20]Zokaites now contends in a pending motion to avoid his lien that the Notice of Distraint included rent due but also is an effort to collect on amounts due in settlement of his prior 2001 claim that were included in Amendment No. 1 to the lease and/or were to be forgiven if Debtors honored their obligations thereunder. Whether distraint is available in Pennsylvania for something other than rent will be determined in that proceeding and is not material in the matter at bench. Moreover, what amounts are due in "settlement" are also at issue inasmuch as Zokaites now has an order of the state court, issued after a full trial, that Amendment No. 1 was a new lease obligation that, *a fortiori*, extinguished the prior lease.

[21]Plaintiffs' Exhibit 21

Despite the automatic stay and notice thereof, Zokaites and his lawyer paid a visit to Debtors' business during business hours on August 21, 2006, to photograph the personalty which Zokaites asserted secured his claim through the Notice of Distraint. He gained entry, after being denied same by Mrs. Lansaw, by following a parent inside. The parties dispute specifically what happened and whether or not Zokaites tried to goad Mrs. Lansaw into an altercation. Regardless of who said what and when, the Court finds that Mrs. Lansaw was quite upset by the incident.

Next, on Sunday, August 27, 2006,[22] Zokaites testified that he used his key to gain entrance to the daycare at a time when no one was there. He observed that Debtors had moved a significant amount of property and some plumbing fixtures out of the space. He then removed the mechanisms that let the doors be opened from the outside. He padlocked and chained the doors (Plaintiffs' Exhibit 10). Debtors learned of this when Mrs. Lansaw's mother, who was waiting for Debtor to help her clean the facility, unsuccessfully tried to stop Zokaites from taking those actions and called the police. After the police arrived (and the Court pauses here to note that the trial testimony identified so many instances of calls to and visits by the police since 2005 that the Court lost count). At the request of a police officer, Zokaites agreed to let Debtor retrieve a client list so that she could call the parents of the children to tell them the business would not open the next day. The parties tried to work out an agreement and were to meet later that evening. Zokaites now contends that he would have voluntarily removed the chains and let the business open on Monday. The Court does not credit his testimony on this point. Zokaites testified that he was trying to stop Debtors from removing collateral to their new space, but it

---

[22]Zokaites testified that this occurred on Saturday. Debtor's mother, Rosemary Smith, testified that it happened on Sunday. Lt. John Love of the Northern Regional Police Department agreed that it was Sunday.

was not until the parties met at the site later in the evening on August 27, in an unsuccessful effort to reach an amicable agreement, which resulted in yet another call to the police, that Zokaites agreed to let the business open on Monday.

On August 28, Zokaites' attorney also sent a draft complaint to Patrick DiCesare, the new landlord, with a cover letter demanding that he terminate his lease with Debtors and stating that if he did not do so by close of business on Tuesday, August 20, 2006, the complaint would be filed.[23]

Faced with conduct attempting to collect a debt and to exercise control over property of the estate and interference with their new landlord, on August 28, 2006, Debtors filed the pending Complaint, and the Motion to Reject the Unexpired Lease.

Zokaites responded to the Adversary action and Motion and filed "Counter Motions" alleging that this bankruptcy was filed in bad faith and should be dismissed, that Debtors were ineligible to file Chapter 13, that Zokaites should have relief from stay because of the bad faith filing and seeking a preliminary injunction preventing Debtors from relocating until all issues are resolved.[24]

The Court finds from the evidence that Debtors' decision to reject the unexpired lease is a proper exercise of their business judgment. *See, e.g., In re Pittsburgh Sports Associates Holding Co.*, 239 B.R. 75 (Bankr. W.D.Pa. 1999). The Court entered an Order to that effect on November 1, 2006, and the temporary restraining order which prevented Debtors from relocating while this

---

[23]Plaintiffs' Exhibit 27

[24]Zokaites' objection to Debtors' exemptions, Debtors' motion to avoid Zokaites' lien, plan confirmation, several state court actions, and the as yet unexpired proof of claims bar date are all pending. The bar date for non-governmental entities is January 2, 2007. D.N. 23

7

matter was pending has been lifted as a result. The Court finds that the bankruptcy was not filed in bad faith, that Debtors are eligible for Chapter 13, and that Zokaites is not entitled to relief from stay at this time.[25] The Court finds that Zokaites' actions in padlocking the premises and changing the locks was in violation of the automatic stay as an action to collect a debt and to exercise control over property of the estate and property of the Debtor. His actions in demanding that the new landlord terminate his lease with Debtors was another effort to control property of the estate and was also an action against the Debtors or their property that could have been commenced prepetition. Thus, the conduct violated the automatic stay. Debtors are entitled to an injunction barring further violations. Debtors may move the collateral allegedly securing Zokaites' claim but, to the extent Zokaites is found to have a secured claim, will be required to pay the full value of that claim with interest through the plan or to abandon the collateral to Zokaites (and pay any proven diminution in value as well). The Court makes no findings regarding plan confirmation issues, which are not before the Court at this time.

## Discussion

The testimony at trial and the post-trial submissions of the parties support the background as recited by the Court. The historical recitation establishes the animosity and distrust between the parties. Mrs. Lansaw was in tears in her various appearances before the Court and during her testimony. Although Zokaites attempts to discredit her behavior as something within her control

---

[25] There is a pending motion to avoid Zokaites' lien as impairing Debtors' exemptions, which, if granted, will make his claim unsecured. An Order avoiding the lien created by Notice of Distraint has already been issued. If the claim is determined to be secured, Debtors will have to provide for its payment in their Chapter 13 plan.

and as unsupported by expert opinion, the Court finds that Mrs. Lansaw is, in fact, so distressed by Zokaites' behavior that, notwithstanding Zokaites' offers to waive a variety of claims to keep Debtors as tenants, she is unable to work in a premises which he owns. An employee of the daycare center, Linda Huston, testified that Mrs. Lansaw is not functioning well in the environment and exhibits behavior at work that is very similar to her behavior in court. This was a significant change in Mrs. Lansaw's behavior. It began eight or nine months prior to trial. The Court credits the facts as recited in this testimony and finds that such behavior is inappropriate in the workplace, especially where young children spend many hours daily.

Mr. Lansaw also testified to his wife's physical conditions, based on his own observation, that she is frequently ill and vomiting and that she cries a lot. Debtors both testified that they would cease operations rather than remain in the current leasehold, and although the Court wonders at the wisdom of such a choice given Debtors' current financial circumstances, the Court credits that testimony. The Court notes that the effect of rejection is simply a breach, *see Cinicola v. Scharffenberger*, 248 F.3d 100, 119 n.8 (3d Cir. 2001), but, in this case, Debtors had anticipatorily breached the lease prepetition by signing a new lease without an intention of operating two daycare centers. Thus, Debtors' motion merely confirms actions Debtors took prepetition – i.e., a breach of the Zokaites lease.[26]

At the trial of the pending Adversary and Motion to Reject, parents of the children in the daycare center testified to their discomfort in the lack of professionalism between Zokaites and Debtors. Witnesses indicated that they will definitely permit their children to remain in the

---

[26] The Court in no way condones Debtors' actions. The Court is reciting the facts.

daycare if Debtors move the business to a new location. However, they will consider other options if Debtors are required to stay in the Zokaites leasehold.

Although Zokaites candidly admits that despite his numerous efforts to evict Debtors, he now wants Debtors to stay as tenants because his property is not at full tenant capacity, whereas it was at least closer to full capacity when he tried to evict them, his need is not the full scope of the Court's review.

Zokaites will have a claim that will be recognized and paid in accord with bankruptcy law. To the extent that Debtors have other creditors, and the schedules show that they do, Chapter 13 is an appropriate vehicle for resolution of all claims. To pay claims, Debtors need an income. At present, Mrs. Lansaw is the person whose income, through her employment with the daycare center, will fund the plan.[27] Mr. Lansaw contends that he will seek some form of income, through social security disability and/or through some employment. Whether he does so remains to be seen and may effect plan feasibility. However, the household has income and the Debtors are eligible for Chapter 13 relief.

Zokaites' contention in post-trial papers that because he is the only creditor actively pursuing collection of debt, Debtors have filed bankruptcy in bad faith, is not borne out by the evidence. Debtors owe several tax claims and are subject to a lawsuit by their former lawyers for failure to pay their legal bills. Surely the filing of such a lawsuit is an effort to collect a debt. Even if it were not, the fact that Debtors owe several creditors is a sufficient basis to file a Chapter 13, in an effort to resolve the debts.

---

[27]The adequacy of plan funding will be addressed in the confirmation process.

Zokaites also asserts that this bankruptcy is in bad faith because Debtors brought it to take advantage of the Bankruptcy Code's lease rejection provisions in §365. The Court cannot find, as a matter of law, that taking advantage of a statute that applies to Debtors' circumstances is an act in bad faith. *In re Jean,* 306 B.R. 708, 716 (Bankr.S.D.Fla. 2004). Moreover, given the tortuous history between the parties, the Court cannot find on the facts of this case, that Debtors are acting in bad faith. If ever a fact pattern cried out for termination of the business relationship between the parties, this one does so. The parents of the children who utilize Debtors' daycare testified that Mrs. Lansaw is a primary reason why they keep their children in Debtors' facility. Mrs. Lansaw cannot and will not continue to perform her duties in Zokaites' leasehold. Thus, if Debtors do not reject the lease and move to a less contentious facility, there will be no business left, and no creditors will be paid from its operations.

Zokaites contends that the case must be dismissed as a bad faith filing because Debtors have failed to disclose assets, including their home and the value of their business. The Court finds that Debtors did not fail to list their home as an asset inasmuch as they do not own it. They live in a home owned by Mrs. Lansaw's mother. Although Debtors apparently claim tax deductions for mortgage interest and real estate taxes they pay in lieu of rent, that is an issue to be addressed by taxing bodies. It does not mean that Debtors own the home.

Regarding the business valuation, Debtors have listed the value as unknown in their bankruptcy schedules. Zokaites produced an accountant who valued the business, based upon a multiple of earnings of four, to be about $200,000.[28] Zokaites incorrectly asserts that Debtors

---

[28] Mark Heidenreich, the expert called on behalf of Zokaites, used certain assumptions in valuing the business and in compiling an adjusted income and expense statement for Debtors that were challenged by Debtors. The Court agrees that certain assumptions were flawed, including,

11

valued the business as worth $6,000. In fact, Debtors listed certain used computer equipment and cribs as worth $6,000 and then exempted same. They did not assign a value for good will, which Zokaites asserts is required. Debtors counter that "good will" is due to Mrs. Lansaw's work and that if she leaves, there will be no good will. Thus, Debtors have not, as yet, placed a value on their business. The business value, however, to the extent it affects the liquidation alternative test and the amount Debtors must pay to their creditors, is an issue to be addressed in the plan confirmation process. The Court makes no findings regarding business valuation at this time.

Regarding the lease rejection damages and rents owed to Zokaites, Debtors will be required to meet the standards for confirmation and to successfully complete their Chapter 13 in order to take advantage of the lease rejection and damage limitations of § 365 and § 502(b)(6) respectively. If they fail, then they will owe Zokaites the full amount of his damage claim.[29] Thus, debtors are motivated to succeed.

Much of the testimony at trial concerned whether rejection of the Zokaites lease was a good economic decision. Unfortunately, Debtors have placed themselves in a position where they must reject either the Zokaites lease or the "new" lease with DiCesare. They have too few daycare clients to operate both facilities. From the testimony, the Court finds that the rental cost to Debtors in either facility is equivalent. Although the rent per square foot is less costly in the

---

inter alia, an add back of the business' vehicle expense and the legal fee adjustment, and the personal expenditure adjustments for federal income tax withholding, cable expense, food expense, trash collection bills, medical and expenses.

[29]Zokaites may have other claims based upon pending litigation which are not before the Court. As noted, the proof of claims bar date has not yet passed.

Zokaites space, the facility at the DiCesare property is more conducive to a daycare business. Debtors have more usable (i.e., non-common areas) space at the Zokaites facility but the DiCesare space is adequate for their needs. There will be no undue burden on this estate by virtue of Debtors selecting the DiCesare property over the Zokaites property. Either way, Debtors will have to pay the landlord whose lease is rejected, in accord with the Bankruptcy Code.

Although Mr. Lansaw testified that Debtors were losing clients, the tax returns (Defendant's Exhibits 51 and 52) and financial documents do not indicate that Debtors' gross income from the operation of the daycare has declined in the past three years. Thus, funds should be available to pay creditors.

Debtors choose to reject the Zokaites lease because of the litigious and unprofessional relationship that has developed between them and which is now of concern to the parties who place their children in the daycare center. This decision is a proper exercise of their business judgment. Several parents testified that they may remove their children if Debtors do not move, and Mrs. Lansaw testified that the number of visitors looking for daycare services at Debtors' facility has declined since the discord with the landlord developed. Debtors blame this decline on the sign, the fact that Zokaites recently replaced large trees that protected an outdoor playground from public view, and to the traffic and fumes from the automobile service next door, and to the tendency of people to talk about what is going on. The Court credits Zokaites' testimony that he replanted trees as part of routine maintenance and that he has vented the car service space so that fumes will not be an issue. One parent, Peter Toriello, however, whose child has asthma, expressed reservations about keeping his child in this facility due to the

nearness of the automobile service and the fact that trucks run their motors inside the facility. In this circumstance, the Court finds that whereas there may be no actual danger, fumes or even increased traffic from the automobile service, parents' perceptions of same[30] will govern whether they place or keep their children in a facility with this business next door or utilize another facility without a similar business in close proximity. But for the one witness who expressed this concern due to a medical condition of his child, however, there is no other evidence of record indicating that the automobile service center is a controlling negative factor.

Another parent, Darlene Wisniewski, testified that Zokaites' appearances at the daycare center, including the incident when he posted the sign on May 8, 2006, for a brief time, are disruptive to the daycare. All the employees stop working and, as on May 8, go to the windows to watch and see what Zokaites will do. In the process, they stop caring for or attending to the children.

Rebecca Lynn Bird, another parent, testified that she is afraid for her child's safety at the Zokaites premises because the landlord is too aggressive. She expressed her concern that the environment is not professional and does not support the children.

Given the disruption to Debtors' business, the concern of the parents, the extraordinary number (and cost) of legal disputes between Debtors and Zokaites, the fact that Debtors can operate only one daycare center at this time, and the involvement of the police at frequent intervals, the Court concludes that the Debtors' motion to reject the unexpired Zokaites lease should be granted.

---

[30]Darlene Wisniewski, one of the parents, testified that she hears rumors about the disturbances created by the poor business relationship between Debtors and Zokaites and that she pays attention to them as a mother concerned with her child's welfare.

For these reasons, the Debtors may reject the unexpired lease with Zokaites. The case will not be dismissed on eligibility or bad faith grounds. An injunction will be issued prohibiting further violations of the automatic stay. Zokaites moved, during a hearing on October 3, 2006, at which the Court announced that the motion to reject the lease would be granted, to stay these orders pending appeal. The Court indicated that his motion would be denied and the orders will so indicate.

Appropriate Orders will be issued.


Date: December 12, 2006                    _____
                                            Judith K. Fitzgerald
                                            United States Bankruptcy Court

THE CASE ADMINISTRATOR WILL SEND COPIES OF THIS MEMORANDUM OPINION TO THE FOLLOWING:

Stanley A. Kirshenbaum
1602 Law & Finance Building
429 Fourth Avenue
Pittsburgh, PA 15219

Jeffrey A. Hulton
Brandt, Milnes & Rea
1109 Grant Building
Pittsburgh, PA 15219

Ronda J. Winnecour
Suite 3250 USX Tower
600 Grant Street
Pittsburgh, PA 15219

United States Trustee
Suite 970
1001 Liberty Avenue
Pittsburgh, PA 15222

FILED
DEC 12 2006
CLERK, U.S. BANKRUPTCY COURT
WEST. DIST. OF PENNSYLVANIA